UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ALLISON LABARBERA,

                       Plaintiff,        **MEMORANDUM AND ORDER**

 - against -                           2:18-cv-6737 (DRH) (SIL)

NYU WINTHROP HOSPITAL,

                       Defendant.
-------------------------------------------------------------------X

**APPEARANCES**

**LEEDS BROWN LAW P.C.**
Attorneys for Plaintiff
1 Old Country Road
Carle Place, NY 11514
By:   Rick Ostrove, Esq.
       Brandon Okano, Esq.

**BAKER & HOSTETLER LLP**
Attorneys for Defendants
45 Rockefeller Plaza, 14th Floor
New York, NY 10111
By:   Amy J. Traub, Esq.
       Amanda L. Van Hoose Garofalo, Esq.

**HURLEY, Senior District Judge:**

## INTRODUCTION

       This case concerns whether the Pregnancy Discrimination Act entitles pregnant women—absent complications, risk factors, or other pregnancy-related conditions—to a medical exemption from her employer's mandatory flu vaccination policy, which was adopted due to "a real question as to the usefulness of face masks, even when properly used, to prevent transmission [of infectious disease] from an infected person."[1] Plaintiff Allison LaBarbera ("Plaintiff") brings this action against

---

[1] Winthrop asserts: "[T]here is no convincing evidence that N95 respirators protect against the spread of flu." Def. Reply 56.1 ¶ 14.

her former employer, Defendant NYU Winthrop Hospital ("Defendant" or "Winthrop"), alleging her termination as a result of her non-compliance with the Mandatory Influenza Vaccination Program Policy (the "Policy") reflects discrimination against pregnant women through failure to accommodate, disparate treatment, and disparate impact violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) (the "PDA"), and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296.  Presently before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Plaintiff unfortunately fails to offer evidence in support of her prima facie case.  For the reasons set forth below, Defendant's motion is GRANTED.

## BACKGROUND

The following facts, taken from the parties' Local Rule 56.1 statements, are undisputed unless otherwise noted.[2]  *See* Def.'s Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1") [DE 22-2]; Pl.'s 56.1 Counterstatement in Opp'n to Summary Judgment ("Pl. 56.1") [DE 22-51]; Def.'s Reply to Pl.'s Rule 56.1 Counterstatement of Facts ("Def. Reply 56.1") [DE 23].

## I.  Defendant's New Influenza Vaccination Policy

Defendant NYU Winthrop Hospital in Mineola, New York offers diagnostic and therapeutic care across nearly every specialty of medicine and surgery and provides a full suite of inpatient and outpatient services to many ill and immunocompromised

---

[2]     *See infra* Discussion Section I.

patients.  (Def. 56.1 ¶¶ 1, 3, 5).  As a New York hospital, Winthrop is subject to state regulations that require, at a minimum, all healthcare personnel not immunized against the flu to wear a surgical mask during the flu season whenever they are in the vicinity of patients.  (*Id.* ¶ 9 (citing 10 N.Y.C.R.R. 2.59(d))).  The New York State regulation guidance identifies "a large body of evidence that healthcare workers can pose a risk to patients and residents by transmitting influenza infection" and that the regulation "protect[s] healthcare workers who are unvaccinated from acquiring influenza from patients and residents."  (*Id.* ¶ 10 (citing Frequently Asked Questions (FAQ) Regarding Title 10, Section 2.59, https://www.health.ny.gov/diseases/ communicable/influenza/seasonal/providers/prevention_of_influenza_transmission/ docs/faq_flu_mask_requirements.pdf (last updated Jan. 2, 2015))).  The regulation does not prohibit hospitals "from adopting policies that are more stringent than" the regulation.  (*Id.* ¶ 11 (citing 10 N.Y.C.R.R. § 2.59(h))).  Until late 2017, Defendant complied by requiring that all employees "either receive the flu vaccine[] or take a required education course and wear a mask in the hospital."  (Jan. 4, 2018 Letter from President and CEO John F. Collins, Ex. M [DE 22-30] to Decl. of Derek Forte ("Forte Decl.") [DE 22-30]).

In late 2017, the Centers for Disease Control and Prevention ("CDC") reported a particularly severe flu season, with increases in illnesses, hospitalizations, and deaths.  (Def. 56.1 ¶¶ 16–17).  This prompted Defendant to adopt the Mandatory Influenza Vaccination Program Policy (the "Policy"), citing a "moral obligation" and a "commitment to protecting [its] patients," including "pregnant women[] and those

with medical conditions that compromise immunity." (*Id.* ¶¶ 18, 20, 26–27; 2017-2018 NYU Winthrop Influenza Vaccination Flu FAQs, Ex. F [DE 22-40] to Declaration of Marlene Davis ("Davis Decl.") [DE 22-34]; Ex. M to Forte Decl.). Defendant states the Policy "was designed to ensure the highest quality of care," "to create the safest possible environment," and to maintain its reputation as "a leader in healthcare" and as a medical institution "holding itself to a higher standard than other[s]." (Def. 56.1 ¶ 19).

The Policy, effective September 2017, required every employee (not just those with access to patient care areas) to either get vaccinated by December 1, 2017 or apply for an exemption by November 1, 2017. (Def. 56.1 ¶¶ 18, 20, 26–27, 30, 33, 35–36; Aug. 15, 2017 Letter from President and CEO John F. Collins, Ex. E [DE 22-39] to Davis Decl.). The vaccination deadline was later extended to December 21, 2017. (Def. 56.1 ¶¶ 36, 39).

In previous years, Defendant gave its employees the option of wearing a mask as an alternative to vaccination. (Jan. 4, 2018 Letter from President and CEO John F. Collins, Ex. M to Forte Decl.). With the new Policy, however, Defendant no longer offered this option. (Mandatory Influenza Vaccination Program, Ex. A [DE 22-35] to Davis Decl.). Winthrop justifies this change by citing a "real question as to the usefulness of face masks, even when properly used, to prevent [flu] transmission from an infected person," as their effectiveness depends on "how [they are] worn, the duration of use, and the circumstances." (Def. 56.1 ¶¶ 14–15, 30 ("[S]urgical masks worn by unvaccinated individuals may not offer the same level of protection as the

vaccine.")).  Plaintiff contests the import of this supposed "real question," suggesting the relevant factors counsel against generalization, such as "the type of mask used" and the difference in use between the "general population[]" and "properly train[ed]" healthcare workers.  (Pl. 56.1 ¶¶ 14–15).  Winthrop replies, "[T]here is no convincing evidence that N95 respirators protect against the spread of flu," and highlights the difficulties (supply-wise, training-wise, efficacy-wise) in offering a mask alternative. (Def. Reply 56.1 ¶ 14).

To roll out the new Policy, Defendant provided a set of Frequently Asked Questions and Answers, held a "town hall meeting," and sent several email reminders.  (Def. 56.1 ¶¶ 26–28, 33–35).  Defendant also asked every employee to complete a Flu Vaccine Survey to disclose his or her intention to get the flu vaccine. (*Id.* ¶¶ 31–32, 123).  The survey did not require employees to reveal which exemption they would seek (medical or religious) nor specify the basis therefor; "[t]o complete the Survey, employees simply indicated whether they were receiving the flu vaccine or whether they were requesting an exemption."  (*Id.* ¶¶ 123–25; Davis Decl. ¶ 24).

Defendant offered, free of charge, four flu vaccines: Fluarix Quadrivalent, Flucelvax Quadrivalent, Fluzone Quadrivalent, and Flublok.  (Davis Decl. ¶¶ 18, 38; Ex. O [DE 22-49] to Davis Decl.).  Each vaccine's prescribing insert discloses risk summaries applicable to certain population groups, including one intended for pregnant women.  (Ex. O to Davis Decl.).  The dispute in this case is largely premised upon certain disclosures in each insert:  "There are insufficient data on Fluarix

Quadrivalent in pregnant woman to inform vaccine-associated risks," (*id.* at 14[3]); "There are, however, no adequate and well-controlled studies in pregnant women. Because animal reproduction studies are not always predictive of human response, this vaccine should be used during pregnancy only if clearly needed," (*id.* at 36 (Flucelvax Quadrivalent); *id.* at 58 (Fluzone Quadrivalent)); "Available data on Flublok administered to pregnant women are insufficient to inform vaccine-associated risks in pregnant women," (*id.* at 89).

Employees could seek an exemption from the Policy on religious or medical grounds. (Def. 56.1 ¶¶ 18, 37). Employees seeking a medical exemption had to submit both a Request for Medical Exemption from Influenza Vaccination form and, on "Attachment A," their healthcare provider's description of a medical contraindication to the flu vaccine. (*Id.* ¶¶ 38, 40, 132). An interdisciplinary team comprised of individuals across several hospital departments, the Influenza Vaccine Exemption Review Board ("IVERB"), reviewed and decided every exemption application. (*Id.* ¶¶ 21–22, 41). IVERB adopted the medical contraindication criteria from the CDC, requiring (1) a previous serious reaction or anaphylactic reaction to the flu vaccine; (2) a documented history of Guillain-Barré syndrome occurring within six weeks of receiving the flu vaccine; or, via a catch-all provision, (3) a medical condition preventing the employee from receiving the flu vaccine, accompanied by a medical provider's documentation as to the condition's nature, duration, and severity. (*Id.* ¶¶ 42–43). IVERB did not accept pregnancy, in and of itself, an acceptable

---

[3]     Exhibit O page citations refer to those listed in the red docketing header.

medical contraindication, (Def. 56.1 ¶¶ 52–55, 57–58, 133, 188; *see id.* ¶¶ 51, 59–61), which aligned with the CDC's determination that "[p]regnant women may receive any licensed, recommended, age-appropriate influenza vaccine." (Prevention and Control of Seasonal Influenza with Vaccines: Recommendations of the Advisor Committee on Immunization Practices – United States, 2017–18 Influenza Season, Ex. C at 5, 8 [DE 22-37] to Davis Decl.; 2017–18 Summary of Recommendations, Ex. D at 1–2 [DE 22-38] to Davis Decl.; *see also* Def. 56.1 ¶¶ 56–57).

The IVERB team reviewing an exemption request could designate one member to contact the employee or her medical provider should the need arise. (Def. 56.1 ¶ 45). Upon granting an exemption, Defendant would perform an Infection Control Risk Assessment to determine what safety measures Defendant would impose on the employee, *e.g.*, transferring her to a different position or requiring her to wear a face mask at all times. (*Id.* ¶¶ 47–48). Denials were communicated via email and could be appealed. (*Id.* ¶¶ 46, 50).

Noncompliant employees—*i.e.*, those unvaccinated without an exemption after the deadline—faced discipline, including potential discharge for insubordination. (*Id.* ¶¶ 23, 49, 95, 187).

## II.   Plaintiff's Request for a Medical Exemption

Plaintiff Alison LaBarbera worked as a per diem Registered Vascular Technologist in Winthrop's Radiology Department – a patient-facing role where she conducted ultrasounds among other duties. (*Id.* ¶¶ 87, 91, 93). In 2016, under

Defendant's previous policy, Plaintiff was vaccinated against the flu.  (Pl. 56.1 ¶ 89; Seasonal Flu Immunization Survey – History, Ex. G [DE 22-24] to Forte Decl.).

When Defendant adopted the Policy, Plaintiff was trying to get pregnant.  (Pl. 56.1 ¶¶ 87, 101, 126).  On September 14, 2017, Plaintiff disclosed in her Flu Vaccine Survey her intention to obtain an exemption from the Policy – though she was not yet pregnant at the time.  (Def. 56.1 ¶ 126).  Plaintiff became pregnant within the following month: she believes her son was conceived on September 21, 2017, and she first learned of her pregnancy on October 12, 2017.  (*Id.* ¶¶ 100–01, 124; Pl. 56.1 ¶ 126).

Plaintiff submitted her first exemption request form on November 10, 2017, without any documentation from a medical provider.  (Def. 56.1 ¶ 130; Davis Decl. ¶ 39).  Marlene Davis, the designated contact person from the IVERB team reviewing Plaintiff's request, called Plaintiff to advise her that her application lacked such documentation.  (*Id.* ¶¶ 52–53, 131–32).  Davis also asked Plaintiff some questions.  (*Id.* ¶¶ 134–35).  In response, Plaintiff confirmed her pregnancy involved no complications and that "there was no reason besides her pregnancy for requesting the exemption."  (*Id.*).  Davis informed Plaintiff that a normal pregnancy was not a medical contraindication to the flu vaccine.  (*Id.* ¶ 133).

The parties dispute Plaintiff's reasons for requesting an exemption.  They agree she was motivated by her pregnancy, her belief that there is a lack of testing of the vaccine on pregnant women, the "vaccination box's [printed advice to] consult your medical professional, and [the box's advice that] pregnant women should only

receive [the vaccine] if medically necessary." (*Id.* ¶ 108). Plaintiff adds she wanted to minimize of the risk of miscarriage in the first trimester, believed wearing a mask rendered the vaccine not medically necessary, and had concerns regarding an alleged lack of studies focusing on the first trimester of pregnancy. (Pl. 56.1 ¶ 108). Defendant asserts that Plaintiff never "shared with Defendant that she was in the first trimester, or that her exemption request related to her being in the first trimester, nor was there any indication on her Exemption Form regarding her being in her first trimester." (Def. Reply 56.1 ¶ 108). That is, Defendant contends no evidence suggests it ever knew how far into her pregnancy Plaintiff was at the time. (*See id.*).

It is undisputed that Plaintiff never "provide[d] any information to Defendant that she had any inability to work, a temporary disability related to pregnancy, or a pregnancy-related condition." (Def. 56.1 ¶ 157; Pl. 56.1 ¶ 157).

On November 14, 2017, Plaintiff had her first appointment with midwife Jeanette Breen, who served as Plaintiff's primary healthcare provider during her pregnancy. (Def. 56.1 ¶ 106). That same day, Breen submitted, on Plaintiff's behalf, a completed Request for Exemption (the "Exemption Request") with Attachment A. (*Id.* ¶ 138). The Exemption Request identified Plaintiff's reason for an exemption— "pregnant"—which Attachment A elaborated thereon—"There is no evidence proving the safety of the influenza vaccine for the pregnant woman or her fetus." (*Id.* ¶¶ 138–40). Davis called Breen later that day. (*Id.* ¶ 143).

The parties dispute the precise details of this conversation. According to Defendant, Davis unsuccessfully requested clarification from Breen, who simply restated the reasoning in Plaintiff's Exemption Request. (*Id.* ¶ 144). Davis then "referred Breen to the recommendations from [the American College of Obstetricians and Gynecologists ('ACOG')] and the CDC regarding pregnant women and the flu vaccine" and questioned the basis of Breen's opinion. (*Id.* ¶ 146). When "Breen was unable to answer Davis's questions," Davis labeled Breen's view a "personal opinion" and not "compelling medical evidence." (*Id.* ¶ 147).

According to Plaintiff, the conversation lasted five minutes, with Davis informing Breen that pregnancy alone does not warrant an exemption and trying to convince Breen to "rescind" her opinion. (Pl. 56.1 ¶ 143). Davis did not mention the ACOG or the CDC; Davis asserted only that "the doctors [at NYU Winthrop Hospital] recommended the flu vaccine for pregnant women and that . . . should be credible." (*Id.* ¶ 146 (quoting Tr. of Dep. of Jeanette Breen at 52 ("Breen Dep."), Ex. H [DE 22-15] to Decl. of Amy J. Traub, Esq. ("Traub Decl.") [DE 22-3])). Davis asked Breen no questions, and the call ended "without resolution" and without discussion on next steps. (*Id.* ¶¶ 143, 147).

On November 17, 2017, Defendant sent an email denying Plaintiff's Exemption Request. (Def. 56.1 ¶ 148). Plaintiff testified that she never saw this email until her supervisor forwarded it to her on November 29, 2017. (*Id.* ¶ 150; Pl. 56.1 ¶ 148). On December 5, 2017, Breen resubmitted, on Plaintiff's behalf, the Exemption Request

"without any changes or additions." (Def. 56.1 ¶ 152). The next day, December 6, Davis contacted Breen for the second time. (*Id.* ¶ 153).

The parties similarly dispute the details of this second conversation. Defendant says Davis "confirmed again that the information provided was not sufficient for a medical exemption." (*Id.* ¶ 153). Plaintiff says Breen believed the "call related to Davis's attempts to convince her that pregnancy was not a valid basis for an exemption" and that Breen "did not acknowledge that Davis said the information provided was insufficient or that Davis requested additional information." (Pl. 56.1 ¶ 153).

On December 18, 2017, Defendant informed Plaintiff that, unless she complied—*i.e.*, was vaccinated—by the end of December 21, she would be terminated. (Def. 56.1 ¶ 158). Having failed to comply, Plaintiff was terminated on December 22. (*Id.* ¶ 159).

## III.    Results of Winthrop's Policy

For the 2017–2018 flu season, 99.3% of Winthrop's ~8,750 employees were vaccinated. (*Id.* ¶ 193; Ex. M to Forte Decl.). Defendant received 125 requests for a medical exemption, of which 42 were granted. (Reply Decl. of Marlene Davis ¶ 6 ("Davis Reply Decl.") [DE 22-66]). Every individual failing to present an acceptable medical contraindication to the vaccine had his or her medical exemption application denied. (Def. 56.1 ¶ 188). All noncompliant employees were terminated. (*Id.* ¶ 187).

Defendant's exemption review process was "blind," such that Defendant did not know whether an employee requesting an exemption was pregnant unless she

stated so on her application. (*Id.* ¶ 191). Only three exemption requests, including Plaintiff's, disclosed a pregnancy. (Davis Reply Decl. ¶ 6). One such employee received a "temporary" medical exemption through the end of her first trimester, warranted according to "medical documentation demonstrating that, based on her medical history and doctor's orders, receiving the flu vaccine in the first trimester was a medical contraindication for her." (Def. 56.1 ¶ 190; Def. Reply 56.1 ¶ 108; Davis Reply Decl. ¶¶ 4, 6). The other two requests, Plaintiff's included, were denied. (Davis Reply Decl. ¶ 6).[4]

## IV.   Procedural History

Plaintiff filed her Complaint on November 27, 2018. (Compl. [DE 1]). She alleges Defendant violated Title VII and the NYSHRL by terminating her "because of her gender and/or pregnancy and/or requests for accommodation" and by adopting a "policy . . . disadvantageous to pregnant women as compared to [its] imposition upon non-pregnant employees." (*Id.* ¶ 39). Plaintiff brings six causes of action: (1) disparate impact in violation of Title VII; (2) disparate impact in violation of NYSHRL; (3) disparate treatment in violation of Title VII; (4) disparate treatment in violation of NYSHRL; (5) failure to accommodate in violation of Title VII; (6) failure to accommodate in violation of NYSHRL.

---

[4]      Defendant speculates "it is possible that Defendant granted many more pregnant employees' exemption requests." (Def. 56.1 ¶ 191). But without an evidentiary basis for this conjecture, it is just as likely that they did not. (Pl. 56.1 ¶ 191). The Court adheres to the known figures provided by the parties.

In discovery, "Plaintiff neither noticed nor took a single deposition in this case." (Reply Decl. of Amy J. Traub, Esq. ¶ 2 ("Traub Reply Decl.") [DE 22-64]).  Defendant took the depositions of Plaintiff Allison LaBarbera and midwife Jeanette Breen.  (*See* Traub Decl. ¶¶ 10–11).

Plaintiff did not retain an expert witness.  (Def. 56.1 ¶ 65; Traub Decl. ¶ 4; *see generally* Decl. of Rick Ostrove, Esq. ("Ostrove Decl.") [DE 22-52]).  Defendant retained Dr. Arnold S. Monto, M.D.  (Def. 56.1 ¶ 63; *see generally* Decl. of Dr. Arnold S. Monto, M.D. ("Monto Decl.") [DE 22-31]).  Dr. Monto's report addressed (1) Defendant's requirement that employees be vaccinated and (2) the use of the flu vaccines in pregnant women.  (Opinion of Arnold S. Monto, M.D., Ex. B at 3 [DE 22-33] to Monto Decl.).  Dr. Monto first opined to "a real question as to the usefulness of face masks, even when properly used, to prevent transmission [of the flu] from an infected person" and that "[t]he influenza vaccination is the most effective preventative measure."  (*Id.* at 3–4).  Second, Dr. Monto stated that "study after study has shown that there is no evidence of a negative effect on the mother or the fetus in taking the [flu] vaccine" and "there is no reason to exempt person from vaccination simply by being pregnant, and there is no evidence to suggest that the influenza vaccine is unsafe for pregnant women."  (*Id.* at 5–6).

Defendant moved for summary judgment on February 24, 2020.  [DE 22].  The briefing narrows the issues to three legal theories: (1) disparate treatment in violation Title VII, (2) disparate impact in violation of Title VII, and (3) violations of

the NYSHRL.  (*See* Def.'s Mem. in Supp. ("Def. Mem.") [DE 22-1]; Pl.'s Mem. in Opp'n ("Pl. Opp.") [DE 22-50]; Def.'s Reply Mem. ("Def. Reply") [DE 22-63]).

## LEGAL STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56, is appropriate only where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When making this determination, a court must view all facts "in the light most favorable" to the non-movant, *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014), and "resolve all ambiguities and draw all permissible factual inferences in favor of the [non-movant]," *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  Thus, "[s]ummary judgment is appropriate [only] where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant]." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts demonstrating that there is a genuine dispute of material fact to be tried.  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-movant

must present more than a "scintilla of evidence," *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586–87), and "may not rely on conclusory allegations or unsubstantiated speculation," *id.* (quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary judgment motions," *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the [non-movant] will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by pointing to an absence of evidence to support an essential element of the [non-movant's] case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady*, 863 F.2d at 210–11) (internal quotation marks omitted). Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). "[A] complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial." *Crawford*, 758 F.3d at 486 (quoting *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986)).

## DISCUSSION

Plaintiff's six causes action are addressed below in three broad sections: Title VII disparate treatment, Title VII disparate impact, and the NYSHRL violations. As a preliminary matter, the Court must address the parties' Local Rule 56.1 statements.

## I.    Local Rule 56.1 Statements

Local Rule 56.1 requires, *inter alia*, that both the summary judgment movant and nonmovant submit "separate, short and concise statement[s]" of the undisputed "material facts." Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Rule 56.1. These statements ought to "streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001).

Given the submissions, it is worth repeating: "*Rule 56.1 statements are not argument*. They should contain factual assertions with citation to the record. They should not contain conclusions." *U.S. Info. Sys., Inc. v. Int'l Brotherhood of Elec. Workers Loc. Union No. 3*, 2006 WL 2136249, at *1 (S.D.N.Y. Aug. 1, 2006) (emphasis in original) (internal quotations omitted) (quoting *Rodriguez v. Schneider*, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999), *aff'd*, 56 Fed. App'x 27 (2d Cir. 2003)).

Despite this instruction, Plaintiff's Counterstatement and Defendant's Reply Statement are rife with argument and conclusions contesting their respective

opponent's "unsupported, inadmissible" assertions.  The parties' submissions reflect four categories of facts: (1) those on which both parties agree;[5] (2) those to which Plaintiff adds qualification that Defendant does not dispute on reply;[6] (3) those on which the parties disagree;[7] (4) those to which Plaintiff adds qualification that Defendant disputes on reply.[8]  The first two categories are deemed undisputed.

The latter two categories implicate facts and argument too voluminous to discuss in detail here.  Nevertheless, upon analyzing the admissible evidence, the Court has disregarded the inappropriate portions of Rule 56.1 Statements.  *Monahan v. N.Y.C. Dep't of Corrections,* 214 F.3d 275, 292 (2d Cir. 2000) ("[T]he trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion." (internal quotation marks omitted)); *Morris v. Northrop Grumman Corp.,* 37 F. Supp. 2d 556, 569 (E.D.N.Y. 1999) ("[R]ather than scrutinizing each line . . . and discussing whether they contain conclusory allegations, legal arguments, or hearsay . . . the court . . . will only consider . . . evidence that is admissible.").

---

[5]     Facts on which the parties agree: ¶¶ 1–6, 9, 13, 16–50, 52–55, 57–58, 62–65, 67–68, 73, 77, 87–88, 90–91, 93–94, 96–107, 109, 111, 116–18, 121–25, 127–31, 133–35, 137, 139–40, 151–52, 157–60, 163–64, 168, 177, 181, 185, 187, 192–94.  *See* Def. Reply 56.1 at 2.

[6]     Facts for which Plaintiff adds qualification that Defendant does not dispute on reply: ¶¶ 10, 92, 95, 113–15, 126, 150, 161–62, 173.  *See* Def. Reply 56.1 at 2 n.2.

[7]     Facts on which the parties disagree: ¶¶ 7–8, 12, 14, 51, 71, 76, 79, 83, 86, 132, 136, 142, 146, 147–48, 149, 153, 156, 165–67, 169, 171–73, 191.

[8]     Facts for which Plaintiff adds qualification that Defendant disputes on reply: ¶¶ 11, 15, 56, 59–61, 66, 69–70, 72, 74–75, 78, 80–82, 84–85, 89, 95, 108, 110, 112, 119–20, 138, 141, 143–45, 154–55, 170, 174–76, 178–80, 182–84, 186, 188–190.

Some statements—*e.g.*, "Defendant is committed to equal opportunity, non-discrimination, and non-retaliation in employment"—are quintessentially immaterial for present purposes. *E.g.*, Def. Reply 56.1 ¶¶ 7–8, 89, 95, 148–49; *see Anderson*, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary will not be counted."). Others contain clearly impermissible legal arguments and conclusions. *E.g.*, Def. Reply 56.1 ¶¶ 11, 14–15, 51, 59, 68, 78, 80, 86, 112, 142, 182; *see Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015) ("[T]he Court can . . . disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement."). To the extent disputed facts quote documentary evidence, expert opinion, or sworn testimony, such facts are considered on this motion – but any of counsel's unsupported factual assertions or legal conclusions drawn therefrom are not. *E.g.*, Def. Reply 56.1 ¶¶ 56, 59, 60, 66, 69–71, 74, 76, 78–86, 140–42, 154, 169–71, 176, 178–80, 182, 188–91; *see Holtz*, 258 F.3d at 74 ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record."); *Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) ("Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative."). Certain factual disputes are moot as a result of Plaintiff's failure to demonstrate a prima facie case of discrimination. *E.g.*, Def. Reply 56.1 ¶¶ 12, 14–15, 51, 165–67, 169–72, 174–75, 182–84, 186; *see Crawford*, 758 F.3d at 486 (quoting *Celotex Corp.*, 477 U.S. at 323).

Other facts are disputed with evidence supporting two opposing views; the Background Section thus includes both views where pertinent. *E.g.*, Def. Reply 56.1 ¶¶ 14, 108, 132, 143–47, 153, 155–56, 165–67; *see Halberg v. United Behavioral Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) ("Where genuinely disputed, 'the Court will consider the sources for the claims made in dueling Rule 56.1 Statements . . . , rather than rely on the Rule 56.1 Statements themselves[.]'" (alteration in original) (quoting *Congregation Rabbinical Coll. of Tartikov, Inc.*, 138 F. Supp. 3d at 396)). "To the extent that there is some variance between the defendant's Rule 56.1 Statement and the plaintiff['s Counterstatement], the facts will be viewed in the light most favorable to the plaintiff[] as [she is] the non-moving part[y]." *Morris*, 37 F. Supp. 2d at 569.

Two paragraphs are worth detailing. First, Paragraph 108 identifies the reasons "Plaintiff claims she requested a medical exemption." Def. Reply 56.1 ¶ 108; Pl. 56.1 ¶ 108. Plaintiff's corresponding counterstatement paragraph adds additional reasons; Defendant objects that these facts are "inadmissible lay opinion and conclusory, self-serving statements that are inadmissible as a matter of law." Def. Reply 56.1 ¶ 108. To the extent Plaintiff's statements are offered to prove Plaintiff's reasons were accurate or justified (*e.g.*, as to the true medical necessity of getting vaccinated or the existence of studies of the vaccine in the first trimester of pregnancy), they are not considered. *See In re Mirena IUS Levonorgestrel-Related Prods. Litig. No. II*, 387 F. Supp. 3d 323, 344 (S.D.N.Y. 2019). Plaintiff's additional contentions—for example, that her "concerns . . . are verified by the medical

literature provided by Defendant's expert"—are likewise not properly considered on this motion.  Pl. 56.1 ¶ 108; *Congregation Rabbinical Coll. of Tartikov, Inc*, 138 F. Supp. 3d at 394.   Second, Plaintiff's Counterstatement Paragraph 110 reflects inadmissible hearsay, except for the assertion that Plaintiff consulted Breen and other healthcare providers regarding the safety of the flu shot.  Pl. 56.1 ¶ 110; Fed. R. Evid. 801; *Morris*, 37 F. Supp. 2d at 568.

With the evidence properly sorted, the Court now addresses the merits.  The Court begins by addressing Title VII generally, before specifically analyzing disparate treatment and disparate impact violations thereof.  The Court ends its analysis by examining the NYSHRL claims.

## II.    Title VII

Title VII prohibits "discriminat[ion] against any individual with respect to . . . [his or her] compensation, terms, conditions, or privileges of employment, because of the individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  In 1978, Congress enacted the PDA to amend Title VII's definition section, clarifying

> The terms 'because of sex' or 'on the basis of sex' include . . . because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.

*Id.* § 2000e(k).   The PDA "makes clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions." *Legg v. Ulster County* ("*Legg I*"), 820 F.3d 67, 72 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.* ("*Newport*

*News*"), 462 U.S. 669, 684 (1983)).

Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). The former, known as "disparate treatment," occurs when an employer "treats some people less favorably than others" because of a protected characteristic, like pregnancy. *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). The latter, known as "discriminatory impact," occurs when facially-neutral employment practices "in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* Proof of discriminatory motive is a critical difference between the two theories: disparate treatment demands it, but disparate impact does not. *Id.* "Either theory may . . . be applied to a particular set of facts." *Id.*

Plaintiff brings both disparate treatment and disparate impact causes of action. Each is separately analyzed in that order.[9]

## III. Disparate Treatment

"[A] plaintiff can prove disparate treatment either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas* [*Corp.*

---

[9]     Defendant says Plaintiff "concede[d]" she has no viable disparate treatment claims because she "failed to respond to Defendant's motion" on this issue. Def. Reply at 2. Yet Plaintiff's third Argument section is titled "Disparate Treatment via Failure to Accommodate." Pl. Opp. at 13. Because "a plaintiff [may allege] that the denial of an accommodation constituted disparate treatment under the Pregnancy Discrimination Act's second clause," the Court disagrees with Defendant. *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 135 S.Ct. 1338, 1354 (2015).

*v. Green*, 411 U.S. 792 (1973)]." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 135 S.Ct. 1338, 1345 (2015). Plaintiff designates her case as one of "direct" discrimination but nonetheless contends the facts suffice to satisfy the "indirect" *McDonnell Douglas* framework. Pl. Opp. at 13–19. In addition to disputing these arguments, Defendant contends "Plaintiff's theory in this case – that the simple fact of pregnancy entitled her to accommodation – is a theory that has already been rejected by the United States Supreme Court in *Young*." Def. Mem. at 8–9. As of the time of this Order, *Young* is the most recent Supreme Court decision analyzing "indirect" evidence of disparate treatment in violation of the PDA.

In the interests of clarity, the Court first assesses Plaintiff's argument regarding "direct" evidence of disparate treatment, then recounts the Supreme Court's holding in *Young* to assess Defendant's argument that it precludes Plaintiff's case, and then applies the *Young*-modified *McDonnell Douglas* framework to Plaintiff's "indirect" evidence of disparate treatment.

### A.    Direct Evidence of Discrimination

Direct evidence of discrimination exists where "an impermissible criterion," like race, "was *in fact* a 'motivating' or 'substantial' factor in the employment decision." *de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 23 (2d Cir. 1996) (emphasis in original) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989)). It can take the form of "a workplace policy, practice or decision [that] relies expressly on a protected characteristic" or "conduct or statements by persons involved in the decisionmaking process." *Young*, 135 S.Ct. at 1345; *Lightfoot*

*v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997); *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992).  In a direct evidence case, a plaintiff's burden is greater than in a *McDonnell Douglas* indirect evidence case.  *de la Cruz*, 82 F.3d at 23; *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d. Cir. 1992).

The Policy is facially neutral: it applies to "all healthcare workers" without mention of pregnancy or any other protected characteristic.  Def. 56.1 ¶ 18.  Plaintiff cites no evidence of Defendant's conduct or statements directly reflecting an attitude discriminatory to pregnant women.  *See* Pl. 56.1 ¶¶ 108–59.  Instead, Plaintiff says "direct" evidence of discrimination exists due to

> a clear difference in treatment of pregnant women as compared to others not in their protected class – that difference manifests itself in a difference in the terms, conditions, or privileges of employment in that pregnant women are subjected to substantially worse employment conditions than non-pregnant employees.

Pl. Opp. at 14.  Specifically, Plaintiff alleges "[t]here is direct evidence that" pregnant women are the only class of persons who would require" an accommodation based on "the lack of research" into the vaccine's safety and the label's warning that pregnant women should get the vaccine "only if clearly needed."  *Id.* at 15.

Plaintiff's assertion, however, does not turn the facially neutral Policy into direct evidence, as Plaintiff has not "show[n] that the impermissible criterion played some part in the decision-making process."  *Tyler*, 958 F.2d at 1183–84 (internal quotation marks omitted) (quoting *Barbano v. Madison County*, 922 F.2d 139, 145 (2d Cir. 1990)).  Nothing in the record suggests that Plaintiff's understanding of the

vaccine's safety and reading of the label, even if accurate,[10] motivated Defendant's actions. *de la Cruz*, 82 F.3d at 23; *Tyler*, 958 F.2d at 1181 ("[A plaintiff] must focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision."); *e.g.*, *Cai v. Wyeth Pharm., Inc.*, 2012 WL 933668, at *7 (S.D.N.Y. Mar. 19, 2012) ("There is no evidence that the people responsible . . . ever said anything suggesting a discriminatory animus.").

Marlene Davis's remark to Plaintiff and Jeannette Breen—that the Policy does not accept pregnancy as a medical contraindication—is not direct evidence of an intent to discriminate against pregnant woman. The Second Circuit has rejected the idea that pregnancy-blind policies illustrate such direct evidence by virtue of their failure to consider of pregnancy. *See Legg I*, 820 F.3d at 74. For example, the *Legg* plaintiff contended a policy accommodating only employees injured on the job was direct evidence of discrimination "because it excluded pregnant women." *Id.* at 70, 74. The Second Circuit disagreed. *Id.* at 74. "[T]he policy did so on a facially neutral basis . . . making it impossible to conclude, without inferring, that the distinction was based upon an intent to discriminate against pregnant employees." *Id.* The Second

---

[10]    While the vaccine label uses the "only if clearly needed" language strictly with reference to pregnant women, Ex. O at 36 to Davis Decl., the label advises individuals with Guillain-Barré syndrome that "the decision to [vaccinate] should be based on careful consideration of potential benefits and risks." *E.g.*, Ex. O at 28, 31 to Davis. Decl.   Presumably, to determine whether a vaccine is "clearly needed" requires "careful consideration of potential benefits and risks."  Plaintiff, however, does not read the label in this manner.  *See* Pl. Opp. at 9 ("[P]regnant women are the only class of persons for whom the vaccination should be used 'only if clearly needed.'  Such a restriction does not exist for other classes of persons." (internal citation omitted)).

Circuit bolstered its conclusion by analogizing the policy to the one in *Young*, whose eligibility criteria likewise did not consider pregnancy.  *Id.* (citing *Young,* 135 S.Ct. at 1354).  "Were [plaintiff] correct, the [*McDonnell Douglas*] burden-shifting framework would have been unnecessary because [the *Young*] policy would have amounted to direct evidence of [defendant UPS's] alleged discriminatory intent."  *Id.* at 74 (internal citations omitted).  This logic commands the same result here.

Because the Court cannot conclude, without inferring, that the Policy reflects an intent to discriminate against pregnant employees, Plaintiff presents no "direct" evidence of discriminatory intent.

### B.    Indirect Evidence of Discrimination

The *McDonnell Douglas* burden shifting framework enables plaintiffs alleging disparate treatment to support their cases with indirect and circumstantial evidence engendering an inference of intentional discrimination.  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82–83 (2d. Cir. 2015).  The Supreme Court in *Young v. United Postal Service, Inc.*, 575 U.S. 206, 135 S.Ct. 1338, 191 L.Ed.2d 279 (2015), modified this framework as applied to PDA claims.  *Young* bears significantly on Plaintiff's case not just for this modification, but also because Defendant argues the *Young* Court "rejected" Plaintiff's theory of her case.  Thus, the Court begins by recounting the Young decision.

1.     *Young v. United Postal Service, Inc.*

a.     **Background and Holding**

Young was a mail carrier for UPS responsible for delivering packages weighing up to seventy pounds. *Young*, 135 S.Ct. at 1344; *Legg I*, 820 F.3d at 72–74 (summarizing *Young*). When she became pregnant, she sought an accommodation from this requirement based on her doctor's recommendation against lifting more than twenty pounds at a time. *Young*, 135 S.Ct. at 1344. UPS refused to accommodate Young, sticking to its official policy of granting exemptions only to employees (i) suffering from an Americans with Disabilities Act ("ADA") covered disability, (ii) without Department of Transportation certification, or (iii) injured on the job. *Id.* Young claimed disparate treatment discrimination against pregnant employees by virtue of their exclusion from accommodations granted to others similar in their ability or inability to work. *Id.* at 1347. UPS contended its "pregnancy-blind policy" treated Young like any other employee with lifting restrictions ineligible under its policy, *e.g.,* one "who injured his back while picking up his infant child." *Young*, 135 S.Ct. at 1344, 1348 (internal quotation marks omitted) (quoting the underlying Fourth Circuit's opinion, 707 F.3d 437, 448 (4th Cir. 2013)).

The dispute before the Supreme Court centered on the meaning of the PDA's second clause:

> [W]omen affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.

*Id.* at 1348 (ellipses in original) (emphasis removed) (quoting 42 U.S.C. § 2000e(k)). Young asserted this clause requires employers accommodating *any* subset of employees limited in their ability or inability to work to provide the same accommodation to all pregnant employees with a similar limitation – regardless of whether certain other nonpregnant employees with the same limitation were unaccommodated. *Id.* at 1349. The Supreme Court rejected this interpretation because it granted "pregnant workers a 'most-favored-nation' status."[11] *Id.* This status would forbid "an employer [from] implement[ing] policies that are not intended to harm members of a protected class, even if their implementation sometimes harms those members, as long as the employer has a legitimate, nondiscriminatory, nonpretextual reason for doing so," which Title VII permits employers to do. *Id.*

UPS read the PDA's second clause to require employers to provide pregnant employees only with same accommodations provided to "others *within* a facially-neutral category." *Id.* at 1349 (emphasis in original). That is, "UPS [contended] that the second clause simply defines sex discrimination to include pregnancy discrimination." *Id.* at 1352–53. The Supreme Court rejected this view as redundant to the PDA's first clause. *Id.* Further, UPS's reading accorded with the Supreme Court's holding in *General Electric Co. v. Gilbert*, 429 U.S. 125, 136 (1976)—"that an employer can treat pregnancy less favorably than diseases or disabilities resulting in

---

[11]   A "most-favored-nation status" automatically and unconditionally would entitle "*all* pregnant workers" to any accommodation extended by their employer to even as few as "one or two workers," so long as they share a "comparable" limitation. *Young*, 135 S.Ct. at 1349–50 (emphasis in original); *see Most Favored Nation*, Black's Law Dictionary (11th ed. 2019).

a similar inability to work"—which Congress sought to overrule with the PDA. *Young*, 135 S.Ct. at 1352–53.

"Writing for the [*Young*] majority, Justice Breyer held that an employer violates the PDA when it treats pregnant employees 'less favorably' than non-pregnant employees similar in their ability or inability to work to such an extent that it is more likely than not that the disparity is motivated by intentional discrimination." *Legg I*, 820 F.3d at 73. Accordingly, the *Young* Court modified the *McDonnell Douglas* framework to focus on "whether the nature of the employer's policy and the way in which it burdens pregnant women shows that the employer has engaged in intentional discrimination." *Id.* (internal quotation marks omitted) (quoting *Young*, 135 S.Ct. at 1344). Employer policies that impose a "significant burden on pregnant employees" reflect intentional discrimination if the employer "accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers." *Young*, 135 S.Ct. at 1354–55. As to Young specifically:

> [I]f the facts are as Young says they are, she can show that UPS accommodates most nonpregnant employees with lifting limitations while categorically failing to accommodate pregnant employees with lifting limitations. Young might also add that the fact that UPS has multiple policies that accommodate nonpregnant employees with lifting restrictions suggests that its reasons for failing to accommodate pregnant employees with lifting restrictions are not sufficiently strong—to the point that a jury could find that its reasons for failing to accommodate pregnant employees give rise to an inference of intentional discrimination.

*Id.* Boiled down, the issue is "why, when the employer accommodated so many, could it not accommodate pregnant women as well?" *Id.*

Defendant here reads *Young* to hold "just because some non-pregnant employees were provided a medical exemption does not mean that all pregnant employees were also required to have been provided a medical exemption." Def. Mem. at 9. This Court agrees. The *Young* Court rejected the assertion that one accommodated nonpregnant employee obliges the employer to accommodate all pregnant employees, which would recognize a "most-favored-nation" status. *Young*, 135 S.Ct. at 1349–50.

### b.     The "Ability or Inability to Work"

Defendant errs, however, in reading *Young* to support its view of *what* constitutes an "ability or inability to work." Defendant contends Plaintiff "did not present with an inability to work" because she failed to "provide[] evidence of temporary disability related to her pregnancy or a pregnancy-related condition that in some way rendered her unable to work" or eligible for a medical exemption from the Policy. Def. Mem. at 8, 12–14; Def. Reply at 9–10. This view improperly conflates Plaintiff's "ability or inability to work"—a necessary condition to warrant accommodation under the PDA—with her ability to "present evidence of a medical contraindication to the vaccine"—a necessary condition to warrant an exemption under the Policy. *See id.* at 11. Plaintiff still may warrant accommodation *under the PDA*, even without a medical contraindication warranting exemption *under the Policy*. The conditions under which the PDA protects pregnant women are not confined to the terms of Defendant's Policy.

### i.     Comparators in *Young*

The *Young* Court's vacatur of the underlying Fourth Circuit decision illustrates this distinction.  The Fourth Circuit held that UPS's refusal to exempt Young from its lifting requirement was not pregnancy discrimination.  *Id.* at 1348 (discussing the Fourth Circuit's opinion, 707 F.3d 437 (2013)).  It noted that Young did not meet any of UPS's three pregnancy-blind bases for an accommodation— (i) ADA disability, (ii) lack of DOT certification, or (iii) on-the-job injury.  *Id.*  As a result, held the Fourth Circuit, Young and the nonpregnant employees accommodated pursuant to these policies were not "similarly situated" – to wit, "similar in their ability or inability to work":

> Young was different from those workers who were "disabled under the ADA" (which then protected only those with permanent disabilities) because Young was "not disabled"; her lifting limitation was only "temporary and not a significant restriction on her ability to perform major life activities."  Young was also different from those workers who had lost their DOT certifications because "no legal obstacle stands between her and her work" and because many with lost DOT certifications retained physical (*i.e.,* lifting) capacity that Young lacked. And Young was different from those "injured on the job because, quite simply, her inability to work [did] not arise from an on-the-job injury."

*Id.* at 1348 (quoting the Fourth Circuit's decision) (internal citations omitted). Defendant's position harmonizes with the Fourth Circuit's holding: neither plaintiff "present[ed] with an inability to work" similar to any accommodated coworkers because they each failed to satisfy their employers' pregnancy-blind accommodation criteria.

But this position is untenable as a result of the Supreme Court's holding. Defendant, like the Fourth Circuit did, fails to "consider the combined effects of [the]

policies," official or otherwise, accommodating employees with a similar ability or inability to work.  *See id.* at 1355.  The identification of comparators[12] "similar in the[] ability or inability to work" involves just that: discerning the extent to which accommodated employees' limitations resemble the plaintiff's.  In *Young*, for example, accommodated injuries included "foot injury," "arm injury," "ankle injury," and "cancer," each of which inhibits lifting ability or strength generally.  *Id.*  The auspices under which an employer accommodates a comparator employee are irrelevant.  It did not matter to the *Young* Court that UPS accommodated its employees with disabilities pursuant to its legal obligations under the ADA, with suspended DOT certifications pursuant to efficient business considerations, with injuries "incurred on the job" pursuant to written policy, or even with injuries "incurred off the job" pursuant to informal practice.  *See id.* at 1346–48.  All that mattered was that the comparator *was* accommodated for a similar limitation.[13]

Accordingly, then, a PDA plaintiff may "present with an inability to work" even if she does not meet any of her employer's pregnancy-blind accommodation criteria.

## ii.  Defendant's Argument

Defendant's distillation of this issue is incorrect.  The issue is *not* "Did [Plaintiff] have a temporary disability related to her pregnancy or a pregnancy-

---

[12]   The term "comparators" refers to those "outside the complainant's protected class" with a "similar ability or inability to work" whom the employer treats more favorably than the complainant.  *Young*, 135 S.Ct. at 1345.

[13]   Justice Alito's concurrence—which seeks to constrain the universe of comparators to those with "the same or very similar jobs" accommodated for a non-neutral business reason—is not binding precedent, as the *Young* majority included five other justices.  *Young*, 135 S.Ct. at 1357–61 (Alito, J., concurring).

related condition at the time she requested exemption from the flu vaccine policy?," which would constitute a medical contraindication to the vaccine.  Def. Reply at 1. That question is relevant only to whether Defendant correctly denied Plaintiff an exemption *under the Policy*.  The Policy, however, is not commensurate with the PDA. The PDA is broader.

The PDA "establishes no assumptions about a pregnant woman's ability or inability to work," *Legg v. Ulster County* ("*Legg II*"), 832 Fed. App'x 727, 731 (2d. Cir. 2020) (non-precedential opinion), and never once uses the terms "temporary disability" or "disability," *see* 42 U.S.C. § 2000(e)(k); *cf. In re Carnegie Ctr. Assoc.*, 129 F.3d 290, 303–04 (3d Cir. 1997) (McKee, J., dissenting) ("[T]he protection afforded pregnancy-related conditions cannot be equated with that afforded temporary disabilities merely because pregnancy is temporary.").[14]  Its use of the inclusive phrase "ability *or* inability" connotes a broader meaning than "disability," a term evoking its ADA statutory definition.  *Compare* 42 U.S.C. § 2000(e)(k) (emphasis added), *with* 42 U.S.C. § 12102 (ADA Definition of Disability).  While "disability" may reveal, by negative implication, one's ability, the same is true for "inability," and the PDA's inclusion of both "ability" and "inability" should be read to avoid redundancies. *Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147, 152 (1883) ("It is the duty of

---

[14]    *See generally* Deborah A. Calloway, *Accommodating Pregnancy in the Workplace*, 25 Stetson L. Rev. 1, 31–33 (1995) ("This reference to 'temporary' disabilities raises the possibility of an argument that Congress intended the disabilities associated with pregnancy to be treated the same as other *temporary* disabilities . . . .  There is, however, little support for reading congressional intent in this way." (emphasis in original) (citing H.R. Report No. 948, 95th Cong., 2d Sess. (1978) and S. Rep. No. 331, 95th Cong., 1st Sess. (1977))).

the court to give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed."). A pregnant woman's "ability or inability" can, of course, reflect temporary disability – but it does not have to.

In conclusion, the United States Supreme Court in *Young* did not reject Plaintiff's theory of her case. *See* Def. Mem. at 8–9.

## 2. The *Young*-Modified *McDonnell Douglas* Framework

While the *Young* decision does not preclude Plaintiff's theory of her case, the application of its modified *McDonnell Douglas* framework to the facts does.

A plaintiff alleging disparate treatment in violation of the PDA can carry her prima facie burden through a "presumption of discriminatory intent" that arises if (1) she belonged to the protected class, *i.e.* was pregnant; (2) she sought accommodation; (3) her employer did not accommodate her; and (4) her employer did accommodate others similar in their ability or inability to work. *See Young*, 135 S.Ct. at 1354 (modifying the *McDonnell Douglas* framework); *Legg I*, 820 F.3d at 73. The required showing is not onerous. *Young*, 135 S.Ct. at 1354 (quoting *Texas Dep't of Cmty. Affs. v. Burdine* ("*Burdine*"), 450 U.S. 248, 252–53 (1981)). If successful, the burden shifts to the employer, who can dispel the presumption with "'legitimate, nondiscriminatory' reasons for denying [plaintiff] the accommodation." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). The plaintiff's case may nevertheless proceed if the preponderance of the evidence shows that the employer's justification is mere pretext. *Id.*; *Legg I*, 820 F.3d at 74. Pretext exists where the "employer's policies

impose a significant burden on pregnant workers, and the employer's . . . reasons are not sufficiently strong to justify the burden." *Young*, 135 S.Ct. at 1354; *Legg I*, 820 F.3d at 74.

The parties agree Plaintiff has satisfied the first three elements of her prima facie case. Def. Mem. 9–10; Pl. Opp. at 14. Defendant's argument on the fourth element is misguided, as explained above, because Plaintiff may still have an "ability or inability to work" even if she did not meet Defendant's pregnancy-blind exemption criteria. *See* Discussion Section III.B.1.b *supra*; Def. Mem. 9–12. Plaintiff's view is likewise imperfect.

### a. The Absence of Comparators to Pregnant Women

Plaintiff states that no employees with a similar ability or inability to work exist because pregnant women are the "only class of person" whose inability to comply with Policy is predicated on a "lack of research regarding" the vaccine's safety and the vaccine label's "warning that it should be administered 'only when clearly needed.'" Pl. Opp. at 15. That is, there are no employees, accommodated or otherwise, with a similar limitation. Plaintiff's framing of her case relies on the unique aspects of pregnancy, for which there are no comparators.

The approach has appeal.[15] Certain limitations and conditions appear to be unique or "endemic" to pregnancy, such that the absence of comparators with a

---

[15]   *See* Jennifer Bennet Shinall, *The Pregnancy Penalty*, 103 Minn. L. Rev. 749, 775 (2018) ("The appropriate comparator, according to the statutory language of the PDA, is a nonpregnant person whose capabilities at work are similar to the pregnant woman. . . . As an initial matter, such a coworker may not exist . . . ."); Reva B. Siegel, *Pregnancy as a Normal Condition of Employment: Comparative and Role-based*

similar limitation outside the pregnant employee's protected class is a fait accompli.

Judge McKee of the Third Circuit seized on this point when he dissented in *In re Carnegie Center Associates*:

---

*Accounts of Discrimination*, 59 Wm. & Mary L. Rev. 971, 983 (2018) ("A comparison of th[e] kind [in the PDA's text] elides the 'uniqueness' of pregnancy and emphasizes instead functional ability to perform the job."); Suzanne B. Goldberg, *Discrimination by Comparison*, 120 Yale L.J. 728, 762 (2011) ("[T]he comparator heuristic misse[s] the possibility, recognized by both the [*Gilbert*] dissent and Congress, that the lack of a comparator did not necessarily mean the absence of discrimination."); Joanna L. Grossman & Gillian L. Thomas, *Making Pregnancy Work: Overcoming the Pregnancy Discrimination Act's Capacity-Based Model*, 21 Yale J.L. & Feminism 15, 34 (2009) ("Yet, the needs of pregnant workers are likely to differ in significant ways from the needs of workers disabled by other causes. . . . [T]he uniqueness of the burdens, which unquestionably exist 'because of' the employee's sex but do not afflict her co-workers makes it difficult, if not impossible, to identify employees 'similar in their ability or inability to work.'"); Judith G. Greenberg, *The Pregnancy Discrimination Act: Legitimating Discrimination Against Pregnant Women in the Workforce*, 50 Me. L.R. 225, 240–47 (1998) ("Although it is unusual for a court to admit that there is no comparable group of nonpregnant employees with whom the plaintiff can compare herself, locating such a group is frequently very difficult. This is because pregnancy is a unique condition and imposes unique burdens on women who become pregnant."); Brooks Land, Note, *Battle of the Sexes: Title VII's Failure to Protect Women from Discrimination Against Sex-Linked Conditions*, 53 Ga. L. Rev. 1185, 1213 (2019) ("If sex-linked conditions related to a woman's reproductive system are not protected under the PDA, women seeking the protection of Title VII will be required to compare themselves to similarly situated males. While it would be beneficial to identify a male comparator in every sex-discrimination claim, it is essentially impossible in most situations regarding female-specific medical conditions."); E. Ashley Paynter, Note, *Defining Disparate Treatment Under the Pregnancy Discrimination Act: Hall v. Nalco Co., What to Do When You Are in a Class of Your Own*, 43 Ind. L. Rev. 207, 229 (2009) ("But there is no true comparison group for women who are undergoing IVF treatment; so, the [*McDonnell Douglas* fourth prong] falls apart upon closer inspection."); Jessica Carvey Manners, Note, *The Search for Mr. Troupe: The Need to Eliminate Comparison Groups in Pregnancy Discrimination Act Cases*, 66 Ohio St. L.J. 209, 223 (2005) ("By failing to recognize pregnancy as a unique biological condition, and comparing pregnancy to injury and illness, employers force pregnant employees to make the same choice between bearing children and maintaining a career that the PDA was meant to eradicate.").

> It is jurisprudential sleight of hand to suggest that the PDA does not require that pregnant women be treated better than their male counterpart. That is a misleading statement of the issue. Thus, the [Seventh Circuit] misses the analytical mark when it states that "[e]mployers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees," unless it defines "similarly affected" employees as other employees having a protected trait that is endemic to the behavior at issue. However, [the Seventh Circuit] fails to do so and assumes that the pregnant employee is the "equal" of her nonpregnant coworker.

129 F.3d at 299–309 (McKee, J., dissenting) (internal citations omitted) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994)). However compelling the approach is, Plaintiff has not identified any precedent accepting it, *see* Pl. Opp. at 13–19, and the Court can find none.

Courts eschew from acknowledging PDA disparate treatment claims premised upon pregnancy's unique effects. Perhaps this traces to the *General Electric Co. v. Gilbert* Supreme Court majority opinion—the case the PDA overruled, *Young*, 135 S.Ct. at 1350—which permitted an employer's disability benefits policy to exclude pregnant women *because of* pregnancy's unique effects. 429 U.S. 125, 139–40 (1976) (recognizing that "pregnancy-related disabilities constitute an additional risk, unique to women"). Regardless, after the PDA, courts have not endorsed disparate treatment claims arising from pregnancy-endemic conditions. *E.g.*, *Dormeyer v. Comerica Bank-Ill.*, 223 F.3d 579, 583–84 (7th Cir. 2000) ("[S]ome of [plaintiff's] absences may have been due to morning sickness, which was, of course, a consequence of her pregnancy. But the [PDA] does not protect a pregnant employee from being discharged for being absent from work even if her absence is due to pregnancy or to complications of pregnancy, unless the absences of nonpregnant employees are overlooked.").

The PDA's text likely impedes an endorsement.  The protections in its second clause expressly activate only when "other persons *not so affected*" have a similar "ability or inability to work."  42 U.S.C. § 2000e(k) (emphasis added).  If that "ability or inability" stems from a condition unique to pregnancy, then the PDA lies dormant because, in Catch-22 fashion, all nonpregnant people would never have that ability or inability.  Simply, all employees "so affected" would be among those discriminated against – and thus not adequate comparators.

Further, the PDA's text expects comparators to exist, thereby instructing PDA plaintiffs to find them and to await dismissal when they cannot.  42 U.S.C. § 2000e(k); *Young*, 135 S.Ct. at 1354 (requiring "that the employer *did accommodate others* 'similar in their ability or inability to work.'" (emphasis added)); *Lewis v. City of Union City*, 918 F.3d 1213, 1222–23 (11th. Cir. 2019) (en banc) ("By its very nature, . . . discrimination is a comparative concept—it requires an assessment of whether 'like' (or instead different) people or things are being treated 'differently.'"); *Washington v. Donahoe*, 692 Fed. App'x 486, 488 (9th Cir. 2017) (affirming a dismissal where plaintiff "identifie[d] no similarly situated employees who were so accommodated" and citing *Young*); *Ruddy v. Bluestream Pro. Serv., LLC*, 444 F. Supp. 3d 697, 709–10 (E.D. Va. Mar. 12, 2020) (dismissing a PDA claim due to plaintiff's failure to provide evidence identifying comparators); *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 855–57 (S.D.N.Y. 2013) ("[T]he PDA expressly requires that she show that 'other persons not so affected [by pregnancy] but similar in their ability or inability to work' received better treatment."); *Santos v. Wincor Nixdorf, Inc.*, 2018

WL 6728483, at *3 (W.D. Tex. Dec. 21, 2018) ("Santos has failed to demonstrate that the Court clearly erred by requiring her to identify a 'similarly situated' comparator in order to establish a prima facie case of pregnancy discrimination."), *aff'd,*7 78 Fed. App'x 300 (5th Cir. 2019).

To be sure, the comparator requirement is "not onerous." *Young*, 135 S.Ct. at 1354 (quoting *Burdine*, 450 U.S. at 252–53). The Second Circuit has described the burden as "de minimis." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (quoting *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009)). In the broader Title VII context, comparators must "bear a 'reasonably close resemblance,' but need not be 'identical,'" to a plaintiff. *Brown v. Daikin America, Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39–40 (2d Cir. 2000)). Specifically for PDA claims, the *Young* Court observed that while a plaintiff and her comparators' "situation[s] [should not] reasonably be distinguish[able]," they need not be "similar in all but the protected ways." *Young*, 135 S.Ct. at 1354–55.

But there must be *some* comparators, and Plaintiff's submissions fail to offer any – by design. Even if Plaintiff or the Court could theoretically articulate a basis to delineate a comparator class, *see supra* note 10, an empty record awaits. Plaintiff offers no concrete particulars revealing to whom, or on what bases, Defendant *actually* granted or denied exemptions from the Policy, medical or otherwise. Def. Reply at 11 n.8. It is undisputed that Plaintiff lacks personal knowledge of any exemption requests, Pl. 56.1 ¶ 194, and her counsel took no depositions in the case, Traub Reply Decl. ¶ 2. No documentary evidence on this issue is annexed to the

summary judgment submissions. The only "specifics" come from Marlene Davis's Reply Declaration, without which the total number of (i) medical exemptions requested, (ii) medical exemptions granted, or (iii) medical exemptions involving a pregnancy would remain unknown. *See* Davis Reply Decl. ¶ 6 (filed after Plaintiff's submissions). There can be no genuine dispute as to whether Defendant "provided more favorable treatment to *at least some* employees whose situation cannot reasonably be distinguished from" Plaintiff's where no evidence specifies *any* employee's situation, accommodated or otherwise. *See Young*, 135 S.Ct. at 1355 (emphasis added).

The only recipient to an exemption identified in the evidence is the pregnant employee discussed in Paragraph 4 of Marlene Davis's Reply Declaration. That paragraph's does not reveal her limitation; it only reveals "she submitted medical documentation demonstrating that, based on her history and doctor's orders," the flu vaccine was a "medical contraindication for her." Davis Reply Decl. ¶ 4. The evidence does not elucidate what that "history," "doctor's orders," or "medical contraindication" actually were. The Court has no way of determining whether her situation can or cannot "reasonably be distinguished" from Plaintiff's: her ability or inability to work is unspoken. *See Young*, 135 S.Ct. at 1355. True, like Plaintiff, she was in the first trimester of a pregnancy. Davis Reply Decl. ¶ 4. But her pregnancy appears incidental to her medical exemption, and Plaintiff gives the Court no reason to think otherwise because this employee goes entirely unmentioned in Plaintiff's submissions. *See id.*; Pl. 56.1 ¶ 190; *see also* Pl. Opp.; *cf. Chambers v. TRM Copy Ctrs.*

*Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) ("Since the court, in deciding a motion for summary judgment, is not to resolve issues of fact, its determination of whether the circumstances 'giv[e] rise to an inference' of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn."). "It is impossible to determine" whether she is a fair comparator "because only speculation can fill the gaps as to [her] characteristics." *Ruddy*, 444 F. Supp. 3d at 709.

Plaintiff mistakenly states that Defendant bears the burden of offering the particulars: "Defendant produces no evidence of the nature of the exemption requests that were denied to" nonpregnant employees. Pl. Opp. at 15. As part of her prima facie case, however, the burden was hers to carry. *Burdine*, 450 U.S. 248, 258–59 (1981) ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally."); *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." (internal quotation marks omitted)). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri v. Dacon*, 759 F.3d 989, 996 (2d Cir. 1985) ("[A] Title VII plaintiff must carry the initial burden of offering evidence adequate to

'raise[] an inference of discrimination.'" (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

Without a showing that "others similar in their ability or inability to work" were treated differently, Plaintiff has not carried her burden and cannot withstand summary judgment.  As a result, the Court need not reach the issue of Plaintiff's failure to "provide any information to Defendant that she had any inability to work, a temporary disability related to pregnancy, or a pregnancy-related condition."  Pl. 56.1 ¶ 157.

### b.    Other Indirect Evidence of Intentional Discrimination

The absence of comparators may not necessarily be fatal to Title VII claims. The Second Circuit has observed that "cases occasionally arise where a plaintiff cannot show disparate treatment only because there are no employees similarly situated to the plaintiff." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).  Such cases are not categorically doomed to dismissal in the Second Circuit, although they may be in other Circuit Courts.  *Id.*[16]

Without comparators, a plaintiff must avail herself of the *McDonnell Douglas* framework's "flexible spirit" and "create an inference of discrimination by some other means." *Abdu-Brisson*, 239 F.3d at 467. (internal citations omitted) (citing *Meiri*, 759 F.2d at 996); *see Furnco Constr. Corp.*, 438 U.S. at 575 (*McDonnell Douglas*

---

[16]    *See generally* Ernest F. Lidge III, *The Courts' Misuse of the Similarly Situated Concept in Employment Discrimination*, 67 Mo. L. Rev. 831 (2002); Tricia M. Beckles, Comment, *Class of One: Are Employment Discrimination Plaintiffs at an Insurmountable Disadvantage if They Have No "Similarly Situated" Comparators?*, 10 U. Pa. J. Bus. & Emp. L. 459 (2008).

framework "not intended to be an inflexible rule"); *see also Young*, 135 S.Ct. at 1353–54 (same).  The "other means" cited by the Second Circuit in *Abdu-Brisson* include an employer's "invidious comments about others in the employee's protected group" or the "sequence of events leading to the plaintiff's discharge."  239 F.3d at 468 (quoting *Chambers*, 43 F.3d at 37 and listing methods of raising an inference of intentional discrimination).

It is not clear whether the benefit of *Abdu-Brisson* extends to PDA plaintiffs, and one court in the Second Circuit has held it does not.  *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d at 857 (citations omitted) ("[Plaintiff's] reliance on *Abdu–Brisson* is misplaced because the PDA expressly requires that she show that 'other persons not so affected [by pregnancy] but similar in their ability or inability to work' received better treatment.").

Even assuming *arguendo* that it does, Plaintiff points to no "pattern of derogatory statements," no indicia of Defendant's "all-consuming interest" in pregnant employees' compliance with the Policy, nor any other means envisioned by the Second Circuit in the absence of comparators.  *See Abdu-Brisson*, 239 F.3d at 468 (citing *Chambers*, 43 F.3d at 37).  Indeed, Plaintiff's theory of disparate treatment asks the Court to find intentional discrimination solely in the terms of the Policy itself, which, as noted, is insufficient for her prima facie case.  *See* Pl. Opp. at 16. Plaintiff cannot meet her *de minimis* prima facie burden for disparate treatment theory, even if it is viable under the PDA, because Plaintiff presents no evidence of intentional discrimination beyond simply articulating how the Policy works.

*O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) ("[A] prima facie [case under *McDonnell Douglas*] requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." (emphasis, alterations, and internal quotation marks omitted)); *Burdine*, 450 U.S. at 252–53 ("[T]he plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination."); *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107–08 (2d Cir. 2019); *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401–02 (2d Cir. 1998). Given the Supreme Court emphasizing a "continued focus on whether the plaintiff has introduced sufficient evidence to give rise to an inference of *intentional* discrimination," Plaintiff's disparate treatment claims cannot withstand summary judgment. *Young*, 135 S.Ct. at 1355 (emphasis in original).

## IV.    Disparate Impact

Title VII expressly forbids any "employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(k)(1)(A)(i), which, through the PDA, includes on the basis of pregnancy. *Id.* § 2000e(k). In disparate impact cases, what matters are the "the *consequences* of employment practices, not simply the motivation." *Griggs*, 401 U.S. at 432 (emphasis in original). Thus, such claims may proceed against facially neutral policies not motivated by discriminatory intent. *See Legg I*, 820 F.3d at 72.

A plaintiff's disparate impact prima facie case requires her "to (1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Chin v. Port Auth. of N.Y. &*

*N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (internal citations and quotation marks omitted).  "An employer may defend against liability by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'"  *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)).  A plaintiff may nevertheless "still succeed by showing that the employer refuse[d] to adopt an available alternative practice that has less disparate impact and serves the employer's legitimate needs.  *Id.* (citing 42 U.S.C. §§ 2000e-2(k)(1)(A)(ii) and (C)).

As of the time of the Order, the Second Circuit has analyzed disparate impact claims in the PDA context only once – in a non-precedential opinion dated October 29, 2020.  *Legg II*, 832 Fed. App'x 727.  It held:

> [T]o establish a prima facie case, a plaintiff pursuing a disparate impact claim under the [PDA] must demonstrate, at a minimum, that some pregnant women are 'similar in their ability or inability to work' to non-pregnant comparators receiving the accommodations sought by the plaintiff.

*Id.* at 731 (emphasis removed) (citing 42 U.S.C. § 2000e(k)).  That is, even in the disparate impact context, a PDA plaintiff cannot avoid identifying comparators.  Plaintiff disavows their existence here.  *See supra* Discussion Section III.B.2.a.

Even if she were to have articulated a comparator class, Plaintiff's proof in support of a disparity is conclusory.  Her statistics are neither "substantial or significant" nor "of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity."  *Chin*, 685 F.3d at 151 (internal quotation marks omitted).  Plaintiff's position is not founded upon record evidence.

For example, Plaintiff states, "[P]regnant women are disproportionately affected [by the Policy] in that they are the only class of persons for whom the . . . disadvantageous conditions exist," *i.e.*, for whom studies do not exist and for whom the vaccine insert says "only if clearly needed." Pl. Opp. at 11–12. Plaintiff's statistical argument goes:

> [T]he Policy forces 100% of pregnant women to inject themselves and their unborn children, despite inadequate testing and lack of medical necessity, or be terminated. As non-pregnant employees are not carrying unborn children, 0% of those employees are subjected to such adverse terms or conditions of employment. . . . Thus, the risk of harm the Policy imposes is experienced by 100% of pregnant employees, and 0% of non-pregnant employees. Such statistical evidence clearly establishes disparity.

*Id.* (footnote and citations omitted). While this rationale may have surface appeal, surviving summary judgment necessitates concrete evidence of a disparity in fact. "Simply proving that all pregnant women will automatically be denied accommodations under the [defendant's] Policy is insufficient" to state a prima facie case of disparate impact. *See Legg II*, 832 Fed. App'x at 732; *Dimino v. N.Y.C. Trans. Auth.*, 64 F. Supp. 2d 136, 158 (E.D.N.Y. 1999) (dismissing PDA disparate impact claim where "[t]he only statistical evidence" was that the policy discriminated against "100%" of pregnant women). Although the Second Circuit did not "identify the precise quantum of proof that would have been sufficient to sustain [plaintiff's] evidentiary burden," it stands to reason that *some* quantum of proof is needed.[17]   *Legg II*, 832

---

[17]   Plaintiff challenges the Policy's impact in its first year, in which only three pregnant women sought an exemption, which raises a concern noted by the *Legg II* Court. 832 Fed. App'x at 732 ("As Legg and *amici* contend with some force, it is unclear how statistical evidence could ever be adduced in an environment where only

Fed. App'x at 732; *Burkhardt v. Lindsay*, 811 F. Supp. 2d 632, 654–55 (E.D.N.Y. Sept. 19, 2011) ("[P]laintiff has presented no evidence regarding how many workers there were in the entire protected group, and therefore the Court is unable to make any determination regarding whether there was a disparate impact on the entire group, or whether plaintiff's . . . termination[] [was] statistically significant."); *Nathe v. Weight Watchers Int'l, Inc.*, 2010 WL 3000175, at *6 (S.D.N.Y. July 26, 2010). ("[T]he record is devoid of any evidence, other than Plaintiff's conclusory statements . . . . A plaintiff cannot proceed with a disparate impact claim when they fail to present any statistical evidence demonstrating that an employer policy created an adverse impact based on [the protected trait].").  The record here, as presented, has none.

The limited statistical evidence in the record, however probative, suggests no disparate impact exists.  Def. Reply at 7 n.3.  Only one of the three known pregnant women had her medical exemption request granted – *i.e.*, 33.3%.  Davis Reply Decl. ¶ 6.  Across Defendant's entire workforce, only forty-two of one hundred twenty-five employees were similarly successful in obtaining a medical exemption – *i.e.*, 33.6%. *Id.*

Therefore, Plaintiff has not demonstrated the existence of a genuine issue of material fact on whether Defendant accommodated comparators "similar in their ability or inability to work," a necessarily element to a PDA disparate impact claim.

---

three employees have been pregnant over the span of a decade.").  But Plaintiff's failure to adduce any evidence obviates a need to address this concern.

*Legg II*, 832 Fed. App'x at 731.  Defendant is therefore entitled to summary judgment on the Title VII disparate impact claim.

## V.    NYSHRL Claims

Plaintiff also alleges three violations of the NYSHRL: disparate impact, failure to engage in an interactive process, and failure to accommodate.

Disparate impact violations of the NYSHRL disparate impact share the same rubric as those in the Title VII context.  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) ("New York courts examine claims under [the NYSHRL] with the same analytical lens as corresponding Title VII-based claims."); *Viscecchi v. Alrose Allegria LLC*, 117 F. Supp. 3d 243, 249 n.1 (E.D.N.Y. 2015) (Bianco, J.); *Assistant Deputy Wardens/Deputy Wardens Assoc. v. City of New York*, 2019 WL 4015119, at *1 n.1 (E.D.N.Y. Aug. 26, 2019) ("The standard for disparate impact claims under Title VII also applies to disparate impact claims under the NYSHRL.").  Plaintiff concedes this point and argues both in concert.  Pl. Opp. at 8 (citing *Van Zant v. KLM Royal Dutch Airline*, 80 F.3d 708, 715 (2d Cir. 1996)).  Because Plaintiff's Title VII disparate impact claim does not survive summary judgment, neither does her NYSHRL disparate impact claim.  *See supra* Discussion Section IV.

Plaintiff argues her NYSHRL failure to engage in the interactive process claim and the NYSHRL failure to accommodate claim in tandem because "[engaging] in an individualized interactive process is itself an accommodation."  Pl. Opp. at 21 (citing *Jochelman v. N.Y.S. Banking Dep't*, 83 A.D.3d 540, 920 N.Y.S.2d 661 (N.Y. App. Div., 1st Dep't 2011)).

Under New York Executive Law § 296, it is an "unlawful discriminatory practice for an employer . . . to refuse to provide reasonable accommodations to the known disabilities, or pregnancy-related conditions, of an employee . . . in connection with a job or occupation sought or held." N.Y. Exec. L. § 296(3)(a). A "pregnancy-related condition" is any "medical condition related to pregnancy or childbirth that inhibits the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." *Id.* § 292(21-f).

Plaintiff has no "pregnancy-related condition," as defined by the statute, because she fails to articulate an inhibited "normal bodily function." Plaintiff's proposes both (i) the "fostering the healthy growth of the unborn child, from conception through birth, while at the same time maintaining the health of the mother" and (ii) "the taking of medication (in this case a flu shot) or declining to take medication" were her inhibited "normal bodily functions." Pl. Opp. at 20. Neither works.

As to the first, Plaintiff does not share how, or to what extent, she was inhibited from "fostering the healthy growth of [her] unborn child" or maintaining her health. Even if compulsory vaccination may have done so, that process is not a "medical condition." Nor is the vaccine's label or the absence of studies performed on pregnant women a "medical condition" contemplated by the NYSHRL statute. *See* § 292(21-f). Moreover, pregnancy itself is not a statutory "pregnancy-related condition." *See* State of New York Executive Department, Rights and Responsibilities: A Handbook for Employees of New York State Agencies at 31 (May 2020) ("The mere fact of being

pregnant does not trigger the requirement of accommodation."), https://goer.ny.gov/system/files/documents/2020/10/equal-employment-opportunity-rights-and-responsibilities-handbook_6_20.pdf.   At bottom, Plaintiff asks the Court to hold that pregnancy could inhibit "fostering the healthy growth of an unborn child" – a semantically-confusing suggestion considering "pregnancy" denotes the growth of the unborn child generally.   *E.g.*, *Pregnancy*, Oxford English Dictionary, (3d ed. 2007) ("[H]aving offspring developing in the uterus."); *Pregnant*, Merriam-Webster Dictionary ("[C]ontaining a developing embryo, fetus, or unborn offspring within the body."); *Pregnant*, Black's Law Dictionary (11th ed. 2019) ("The period during which a woman or female animal has a fetus growing inside her body."); *Cf. Krause v. Lancer & Loader Grp., LLC*, 40 Misc.3d 385, 397, 965 N.Y.S.2d 312, 322 (N.Y. Sup. Ct., N.Y. Cnty. 2013) (holding "plaintiff has failed to allege any 'impairment' that she suffered as a result of her pregnancy which caused any behavior for which she was allegedly terminated" in the context of disability discrimination claims).

As to the second purported bodily function, it would be strange to include taking or declining medication among one's "normal bodily functions."   Medication *affects* bodily functions, normal or abnormal, but to partake or not to partake is essentially a decision, a choice.   It does not *become* a bodily function merely because it alters *how* the body functions.

Defendant is therefore entitled to summary judgment on the NYSHRL claims.

**CONCLUSION**

As a consequence of Plaintiff's failure to provide evidence in support of her prima facie case as to her PDA and NYSHRL claims, the Court need not engage with Winthrop's rationale in adopting the Policy or applying it to Plaintiff.  On that point, however, the Court is underwhelmed with the position taken by the hospital concerning masks—taken well-after the onset of the COVID-19 pandemic and contradicting public statements by both Winthrop and its expert[18]—but the efficacy of the masks is *not* the issue before the Court.  The Court's task here is to determine whether Defendant discriminated against Plaintiff on the basis of pregnancy, which begins by analyzing the evidence in support of Plaintiff's prima facie case.

That analysis demonstrates that Plaintiff has failed to present a prima facie case of discrimination.  Yet, lest it go unsaid, the parties might have been better off pursuing the compromise within their reach from the outset: (i) Winthrop avers it

---

[18]    *Compare* Def. Reply at 14–15 (dated May 22, 2020), *and* Def. Reply 56.1 ¶ 14 (advocating in earnest against "the usefulness of face masks, even when properly used, to prevent transmission [of infectious disease] from an infected person") (dated May 22, 2020), *and* Reply Declaration of Dr. Arnold Monto ¶ 64 ("Monto Reply Decl.") [DE 22-65] (dated May 21, 2020), *with* @NYULangoneLI, Twitter (June 1, 2020 12:56 PM), https://twitter.com/NYULangoneLI/status/1267500161925877763 ("Use of cloth face covering can help slow the spread of #COVID19."), *and* Robin Erb, *A Michigan Guide to Wearing Masks, or Not, During Coronavirus*, Bridge Michigan (July 15, 2020) ("'The evidence is pretty clear and it's accumulating that [masks] work,' Monto told Bridge. 'It's not an absolute, but nothing is an absolute.'" (alteration in original)), https://www.bridgemi.com/michigan-health-watch/michigan-guide-wearing-masks-or-not-during-coronavirus.  Winthrop's reply papers were served after the CDC publicly changed its guidance to support masks on April 3, 2020.  *See* CDC, *Coronavirus Disease 2019 (COVID-19): Know How It Spreads*, https://web.archive.org/web/20200403234622/https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (archived website from Apr. 3, 2020).

*would* have accommodated Plaintiff if she made certain disclosures in her Exemption Request, Davis Reply Decl. ¶ 5, and (ii) Plaintiff was a per diem employee not categorically opposed to vaccination, offering not to "pick[] up shifts" until after her pregnancy, Pl. 56.1 ¶ 89; November 29, 2017 Email from Allison LaBarbera to Patrice Villa, Ex. J [DE 22-27] to Forte Decl.

Nonetheless, for the reasons stated above, Defendant's motion for summary judgment is GRANTED.  The Clerk of Court is respectfully directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York        s/ Denis R. Hurley
       March 16, 2021             Denis R. Hurley
                                        United States District Judge